The 4th District Appellate Court of the State of Illinois has now convened. The Honorable Craig H.D. Armon presiding. Good morning, counsel. We'll call case number 4-23-0035, People of the State of Illinois v. Cameron D. Ballard. Would counsel for the appellant please state your name for the record? Joshua Scanlon. Thank you. And counsel for the appellate, could you please state your name for the record? Allison Page Brooks. Thank you. Mr. Scanlon, you may proceed. Thank you, Your Honor. May it please the court, counsel, my name is Joshua Scanlon and I am here today representing Cameron Ballard in his appeal and requesting that this court reverse his conviction outright or in the alternative remand his case for a new trial. The sole witness testifying to the identity of the shooter in this case was LaKayla Williams. At first, she told police that she did not know anything. But eventually, on her own, she told Officer Van Hyning that it was her cousin, someone who knew who she was and whom she was afraid of. When later asked about the shooter's clothes, again on her own, she said he was wearing a white t-shirt, jeans, and Tims, a bootleg shoe. There was a person at the scene of the offense who met most of the description she gave when she was speaking to police on her own. It was not Cameron Ballard, but rather it was her cousin TJ Matthews, whom she specifically testified was carrying a gun. However, when she called her mother, specifically because she needed someone to tell her what to do, her identification rapidly shifted away from her family member who was carrying a gun and on to Cameron Ballard, who Williams ultimately testified had no relationship to her, no involvement at all in the fight amongst her family members, and absolutely no reason to shoot Christian Rex. Williams' identification here was entirely unreliable, where it was not based on her independent recollection of the events that occurred, but was wholly based on her mother providing her with Mr. Ballard's name and picture, as provided to her by an entirely different family member. This made the evidence of identity in this case wholly insufficient for conviction. The reliability... Excuse me. Good morning, counsel. Good morning. Question for you with respect to this lineup. Do you agree, certainly, that for a lineup to be tainted, there must be some state action involved with that? In other words, it's the officer who puts together the lineup and shows the lineup to whomever, the victim or whoever's involved in the investigation. Do you agree? For purposes of due process, I agree that state action is required for a tainted lineup under due process considerations. However... Well, you may be anticipating my question, but here, we don't have that at all. Do we? I mean, we have LaKayla's mother who showed her the Facebook photo ahead of time, but I'm not sure how that could be any improper state conduct. And, Your Honor, I agree that it's not improper conduct by the state. However, that does not mean that it was not an overly suggestive lineup or that the lineup itself wasn't tainted in a way that unfairly prejudiced Mr. Ballard when it was used as evidence against him at trial. While that might not be sufficient for a due process claim, under the ordinary rules of evidence, evidence that is overly prejudicial and has no probative value can be excluded. And it's counsel's duty as counsel... Well, two ways of describing prejudice here. First of all, whether or not it was overly prejudicial as compared to its probative value, and then whether or not counsel's action was prejudicial. So, taking that first prejudice that I believe is what you're discussing first, that goes to the examination of the reliability factors laid out in Neal v. Biggers and People v. McTush. Now, this was unreliable here because it was not based on her independent recollection of events, and that involves analyzing each of those factors. Those six factors, as you alluded to, I believe most of them, beginning with opportunity to view. Here, she did not have a sufficient opportunity to view the person that she was later saying was Mr. Ballard. This encounter was very brief. It was under five minutes from the time that Ms. Williams pulled into the alley to the time that she sped away. So, it occurred in less time than we have currently spent since the court opened this argument. The altercation was done in that amount of time, and during that five-minute altercation, she glanced at this person that she later said was Mr. Ballard twice for very brief glances while she had three other people in her face yelling at her. She only glanced over there for moments, something that stays agreed. Her statements to him suggested this was a brief, momentary glance in that direction. He was at a distance for that first glance that she had. She said he was way back by the house while she had her cousins in her face yelling at her. And the second glance that she said she saw the person occurred after the gunshot, when everybody was running away, and could only have been of the back of the person as he was running away behind the car, as Ms. Williams would have had to be turning over her right shoulder to view him. This is not a sufficient opportunity. But she identified him as that person or that kind of person. Is that correct? It's correct. Yes, Your Honor. Her testimony was that he was somebody who hung around that area, and that was her basis for stating that she had seen him before or that she had some level of familiarity with him. However, she ultimately contradicted… She ultimately said something that hung around. Maybe I'm adding gloss to that, but I thought she made some remark about, you know, he hung around for the food or the alcohol, or he was a hanger-on that wasn't really part of the family. I believe the specific thing she testified, I believe the word she used was a bum, and I believe she testified that he hung around smoking at the home. And this did not mean smoking cigarettes, or maybe she did. She did not specify, but then she also contradicted her testimony when defense counsel asked her about that, and she said, no, I didn't say that. She said, I didn't say he was smoking. So to the extent that she provided some basis for the idea that she was familiar, she later contradicted it in multiple ways. First by saying that she didn't actually say that, and then later by saying, no, he wasn't somebody who was a family member. No, she didn't know him. No, he didn't know who she was or where she lived. And no, he had no family relationship to her and no reason to be involved in the conflict. Indeed, when she was testifying… So that goes to her level of acquaintance with him, which was largely, again, entirely inconsistent. Going back to the second factor here, degree of attention, while she was testifying about what she was paying attention to and about these brief glances that she had in this person's direction, she specifically testified that she immediately discounted the person's presence, that he became a non-factor and she no longer paid attention to him because he wasn't involved in the conflict. Can I ask a broader question, perhaps? Certainly, Your Honor. We've all… well, everyone's been asking you questions about certain aspects of the facts. Considering what our standard of review is, the trial court had all these facts, did it not? Yes, Your Honor. Okay. And the arguments you're making are either identical to or similar to arguments that were made before the trial court, correct? Certainly, they're similar to you, Your Honor. Yes. Okay. So what is it about what you're arguing to us that should cause us to conclude that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt? Well, taking all of these factors into consideration as a whole, that the identification itself was not sufficiently reliable for the trial court to have concluded that it was sufficient. And in particular, if you look at what the trial court considered, it was her identification and her identification coupled with testimony about the guns. Now, let's take that… Well, other things like the telephone calls from the jail didn't help him a lot, did they? Certainly, the jail calls… Well, the jail calls ultimately did not provide any particular evidence to suggest that he was any more… … or at least innocence for this particular offense, and that he wasn't involved or that he wasn't the shooter. If nothing else, they suggest that he didn't want to provide information as to who was because snitches get stitches, as his quote was, because he didn't want to be somebody who snitched on someone else. It was somebody named Shanice that put him in the very near location to where the actual shooting took place, correct? In the area of… Yes, in the area of the house, at least. Near the rear of LaCayla's vehicle. Yes, or perhaps behind LaCayla's vehicle somewhere. Which then corroborates LaCayla's version of what happened. It corroborates that he was in the area, Your Honor, yes, but I don't believe that it corroborates ultimately her version of where he was at the time of the shooting. Certainly, it would corroborate that he was there. And again, no more than what the surveillance photos establish. And what Matthews and Morrow said, yes, he was there around that time. They weren't sure exactly where he was or if he had come back at that time. I believe Morrow was the only one who said, other than Williams, who said, yes, she saw him sometime during the altercation, again, behind the vehicle, back by the house. But there's no testimony as to the distance or whether or not he was close enough to be somebody who may have fired a shot. Again, that was solely based on Williams' testimony that she saw someone on the passenger side of the vehicle. Her testimony was the only evidence that placed anyone in that position or that specifically identified Ballard as somebody who could have been in that position. And again, this goes back to the reliability of that. It was not reliable where it didn't establish each of these factors. And where she ultimately didn't have that sufficient opportunity to view, a sufficient degree of attention. And going to the third factor, an accurate prior description of who the shooter was, particularly where the clothes were entirely different. The clothes that she testified or that she provided to police were a white T-shirt, jeans, and a Timbs or boot type shoe. The person who most closely matched that description was T.J. Matthews, as evidenced by the surveillance photos and Matthew's own identification of his clothing and Ballard's clothing. And Ballard was wearing the opposite of that. He was wearing a black shirt. He was wearing blue shorts, bright blue shorts as compared to jeans. And he was wearing flip flops and socks. This is a completely inaccurate description of what the shooter was wearing if it was Ballard. So the accuracy of the prior description doesn't weigh in her favor either. And ultimately the remaining factors, the level of certainty and the time between the crime and the confrontation should be neutral here where the basis of her certainty and the basis of her identification were her mother's providing her that photo and that name at that time. From that moment on, she didn't dispute certainty, certainly, again, because her mother was the one who provided her with that at that time, very close to the shooting. And there was no reason for her to go back from that at that point. And the time between the confrontation, again, because of the suggestiveness of her mother providing that photo at that time should weigh against it because then it should be measured from the crime to her identification at trial, which was over a year later. It should weigh against or at least neutrally on that factor. So none of the factors ultimately weigh in favor of a reliable identification. And at best, some of them are neutral where they were impacted by the suggestiveness of that identification. And because that identification was unreliable, there was ultimately no evidence to connect Mr. Ballard to the crime. There was no physical evidence tying him to the crime. And indeed, Williams, again, Williams' own testimony implicates Matthews more than it does Ballard, where she established that Matthews not had a motive where he was yelling at Rex, calling him an outsider, telling him to get away. And he had the means because he had a gun in his pocket that Williams testified she saw. And he had the opportunity because he was within that vicinity, that close vicinity to the car where he could have fired the shot that killed Rex. Without a reliable identification, the evidence is simply insufficient to establish Mr. Ballard's involvement in the offense and therefore to uphold Mr. Ballard's conviction. However, even if this court ultimately disagrees that the evidence is insufficient, this court should then still remand this case for a new trial where counsel was ineffective for failing to seek suppression of that highly suggestive lineup identification by Williams. Counsel's representation was deficient, where a motion to suppress or at least a motion to exclude that lineup would have been meritorious on the basis that the identification was entirely based not on a clear and untainted lineup, but on her mother providing her the picture of Ballard moments before she entered the lineup. Counsel, of what significance, excuse me, of what significance is it to your argument that the detective who conducted the lineup did not know about the viewing by LaKayla of the picture that her mother showed her at the time the lineup was conducted? It has no significance at all to my argument. And the reason is, other than the fact that that officer ultimately testified that he had never allowed that before, he wouldn't allow it, and he admitted that it could, that her mother's involvement providing that picture before the lineup could taint the lineup. Ultimately, that he wouldn't have allowed that had he had he known about it. That I think is significant in showing the suggestiveness of Miss Williams' mother providing that photo right before the lineup. However, the fact that the officer didn't know it doesn't have any bearing on whether or not counsel should have sought suppression on the basis that this was an overly suggestive lineup because he had essentially been spotlighted right beforehand. She was shown a picture of the defendant right before she was shown a photo array of possible suspects, and so she didn't pick him out of that array of suspects sight unseen. She had seen a photo of him right before. This made it highly suggestive. This made it highly more likely that she was going to select him out of that lineup, and it ultimately made the probative value of that lineup absolutely zero because the reason she selected it was not because she selected him from an array of people, but because her mother had given her the name and the photograph right beforehand. That made it both highly likely that she would misidentify him or that she would identify him entirely based on her mother's providing the photo, as opposed to her independent recollection of who the person was at the time. That is what made it a highly suggestive lineup, and under the ordinary rules of evidence where the likelihood of prejudice from the evidence outweighs the probative value, that evidence can and should be excluded, and it was counsel's duty to bring that balancing test to the court's attention and ask for suppression of that lineup. And it was further prejudicial to him where it provided this false corroboration of her identification at trial, of the idea that she had from an independent recollection identified him, and where the state used it in closing arguments to argue that her identification of Ballard was valid because she identified him at this pretrial lineup, and now she's identified him again at trial. So, I think the time is up, if I may briefly conclude. That's fine. Based on these arguments, we'd ask that this court reverse his conviction or otherwise remand for new trial. Thank you. Thank you, counsel. Ms. Brooks, you may proceed. Thank you, your honors. May it please the court and counsel. I'd like to start with the second issue first, the pretrial identification and effective assistance of counsel argument. It seems like the defendant is falling back from the due process suppression argument to merely an evidentiary standard of whether the probative value is substantially outweighed by the prejudicial effect. To be excluded under the rules of evidence, the probative value has to be substantially outweighed by prejudicial effect. And in this case, where an eyewitness ID, particularly the main eyewitness identification, has to be overwhelmingly probative. To take this sort of evidence away from a trier of fact on this grounds, I think a trial court would be extremely reluctant to do so, particularly where, in this case, most significantly, in this case, the eyewitness has a preexisting familiarity with the defendant. So the asserted suggestiveness of the identification procedure was primarily the outcome of that was to put a name to the face, the face of which the witness, LaKayla Williams, was already familiar with. So, therefore, this is not the type of situation where a motion to suppress would have been granted on evidentiary grounds, on the grounds of asserted insufficient probative value. We're talking about an eyewitness identification in a murder case. I can't think of anything more probative than that. So that motion to suppress, if it had been brought, would most certainly have been denied and, therefore, the defendant can't prove either incompetent representation or prejudice. This is not a situation where every reasonable attorney, every competent attorney, would have filed a motion to suppress on grounds of insufficient probative value for an eyewitness identification in a murder case. Counsel, how does the fact that LaKayla's mother showed her this Facebook photo minutes before she viewed the lineup, I mean, how does that affect the probativeness? Doesn't it significantly reduce the probativeness of her identification at the lineup? How could it not? Well, there is an impact, and that's why it's something that under the, excuse me, I think it was the TB case, but I mentioned that, excuse me, issues like this that affect the reliability, that goes to the weight of the evidence. So this is the type of issue with evidence that concerns the weight that the trial fact would give it, not its admissibility. Well, weight, but, I mean, again, how could there be significant weight given to this by the trial court under the circumstances that opposing counsel has described? I'm sorry, is the question as to the sufficiency of evidence or the admissibility of the evidence? I need to understand the question. Really? Well, let's talk about the, you talked about the weight. Let's talk about the weight that was given. I mean, we know that there were two quick glances that she barely knew him from previously. I mean, how could the trial court have given the weight that it did to this identification? Well, I think the more significant part of this case is that the Kay Williams is not really the key to this case. This is a circumstantial case, and Shanice Morrow, I think, was the more significant witness, actually. She's the, excuse me, pardon me a second. That's okay. Thank you, pardon me. So, Shanice Morrow is the one I think that was relied upon most heavily by the trial court for confirming that everyone else was by the driver's side of the car. So, what defendants suggest, I think, is that T.J. Matthews was the shooter, was actually refuted by Shanice Morrow, who confirms that although T.J. had a gun, but he didn't, he wasn't the shooter, according to Shanice Morrow. No one identified T.J. Matthews as a shooter, that everyone else was by the driver's side of the car. And then the more significant part of this case is the fact that one spent casing nothing on the ground. The only thing that was found was inside the vehicle on the passenger side, and that the bullet path went from right to left, which means the shooter with a stippling, which is unburnt, the gunpowder, that must be extremely close range to be seen on the body of the victim, that shows that the shooter was basically standing right outside the passenger window. And no one else at the scene that was involved in this altercation, other than the defendant, was in that spot. So, I think that's why the trial court realized by process of elimination that it's not anybody else. It must have been the defendant who was by the rear of the car, according to Shanice Morrow. So, that strongly corroborates LaKayla Williams' identification. So, by itself, LaKayla Williams does not need to be sufficient to prove beyond a reasonable doubt, but it's the corroboration through Shanice Morrow's account. And I think also, I think the defendant misclaims that there's no reason to shoot, and that I think was testimony from LaKayla Williams that she heard Kimberly Patterson, one of the women there involved, and the altercation yelled that Rex had a gun, Christian Rex was the victim, and that Shanice Morrow, she heard, LaKayla Williams heard Shanice Morrow scream a command to blow his ASS down. So, that there was sort of like, and the defendant admitted in his telephone call in the jail that his recollation of this event was hazy because he was messed up. And so, that's why I think in this sort of situation, putting all this evidence together, because the victim has a gun, and there is an altercation involving two women, TJ Matthews has a gun, the victim, Christian Rex, has a gun, and there's these commands shouted, he's got a gun and shoot him, basically to command to shoot him. The defendant takes his matters into the hands there and uses his gun to shoot and kill the victim. If I can ask you a question again back on the identification issue. In the conversation that she had with her mother, it appeared that she's just trying to find out whether the person she knows to be this bum or mope that has been described previously is the guy whose name is being used. Not that she can't identify the person, she knows what he looks like, she just doesn't know what his name was. That was the impression I got. Am I misunderstanding that conversation? My understanding is that LaKayla Williams knew what the shooter looked like, and based on the provided description she gave to her mother, her mother was aware of who that individual was through, I guess, his mother that she knew, and so she was able to pull that photo up on Facebook. But the only way she was able to do that is because, by inference, LaKayla Williams provided an accurate description of Cameron Ballard, the defendant. And was there any question that the person she was describing as the guy that hangs around, the guy who just seems to be there for the food and the alcohol, whatever, was anybody other than Cameron Ballard? Somebody else identified as, oh, no, no, no, that's the guy that is hanging around here, it's not this guy. Oh, I don't really understand how to answer the question. I just, I mean, there are some issues with identification the defense points out, you know, with respect to her changing her story or the differences in the clothing. So I'm not saying that this is far from a perfect identification, obviously, notwithstanding the involvement of the LaKayla Williams' mother and the Facebook photo. So that's why I guess the state is more heavily relying on the circumstantial evidence of the shell casing and the stippling in combination with what Sharnice Morrow and the other participants identified the locations of the other individuals who are involved in the altercation. I think that LaKayla Williams' identification testimony doesn't have to be very strong at all to be just one of the pieces of the very large puzzle. So that's why, you know, to show that this is a sufficient evidence doesn't have to be, and the trial court rationally reaches the result, doesn't have to very strongly rely on LaKayla Williams' identification. This is not the only piece of evidence far from it. So that's why, despite its issues, it's still enough of a contribution to the entire piece of the puzzle that the trial court was confidently able to, with respect to, you know, the evidence to simply say the defendant was the only person in the spot where a shooter had to be in order to have to meet the physical evidence, the stippling and where the shell casing landed. No one else got to that spot. The defendant was the only person who was by the back of the car who could have been there. So, I mean, this strong, overwhelming inference was that that was the defendant and that the issues with her identification, at least in the very specific circumstances of this case, the trial court very reasonably believed the credibility of LaKayla Williams. And then this court must very strongly defer to the trial court's findings on respect to the evidence and the credibility. And it would be very difficult to reverse a case like this. It is very fact and credibility intensive. Notwithstanding, there are some issues with the case. I mean, that's why the defendant is appealing and he has some good arguments on his appeal, but just it's a very difficult case for him to overcome the strong circumstantial evidence that the trial court relied upon. So, for those reasons, the state would request this court to affirm the conviction. Thank you, Your Honors. Thank you, Counsel. Mr. Scanlon. Yes, Your Honor. So, I think I'd like to touch on three things. And starting with the second argument, as opposing counsel did, I would like to state two things with regard to the argument of ineffective assistance of counsel. And first and foremost, to focus in on what Justice Zinoff, what you pointed to, that there was ultimately no probative value to this lineup identification where she had received the photo from her mother just beforehand. And where there was no probative value of that, because the lineup was based entirely on that photograph or based on seeing that photograph immediately beforehand, then the suggestiveness, the prejudice of her mother tainting that clearly had to substantially outweigh the probative value. In order for it to not outweigh the probative value, there would have to have been some probative value to the lineup. Without that, we're relying entirely on the fact that her mother provided her with that photo and that identification, not a neutral and reliable lineup. And under those circumstances, opposing counsel also pointed out or agreed that this was a highly credibility-based case. Where this was entirely based on the credibility of LaKayla Williams' identification, failing to suppress that evidence had a very strong prejudicial effect in this case. Because it served as this false corroboration for the identification, the idea that there was this neutral, reliable lineup. And the state then used that in closing argument, establishes the prejudice of counsel's failing to suppress it or ask for the lineup to be excluded. Going on to the sufficiency of the evidence, again, back to what her mother's role was in this case. And Justice Jarman, you were asking opposing counsel about what this conversation was about that she had with her mother and how her mother's intervention ultimately affected the reliability of this identification. And the fact is that Ms. Williams testified very explicitly that she called her mother there to tell her what to do, to tell her what she should do, what she should say. And even when – I'm sorry, go ahead. My interpretation of the conversation between her and her mother was, I know who the person is, I just don't know his name. And she described characteristics of the guy she was talking about and some bit of a physical description, and that's how she came up with the photograph to show her in the first place. I see that distinctly different than – I don't really know who this person is, and I need some sort of information that will help me pick the right one. I see that distinctly different from – I know who the guy is. I just don't know his name. He's the guy that hangs around all the time. He's the guy that has – I can't remember if she said he had a limp or something. I don't recall exactly. Certainly, Your Honor. And that distinction makes sense. But the testimony from her and from her mother was highly unclear as to the extent that this was about somebody she knew versus somebody her mother was giving to her. In particular, her mother's explanation of what the description LaKayla gave her was was distinct from what LaKayla said it was and from what police said it was. Her mother said she said it was a dark-skinned individual and that it was based on her description of a dark-skinned individual who hung around the house that she provided Miss Williams with the photo. But then Miss Williams said that it was a light-skinned individual who was there. So the extent to which she knew who this was before her mother provided her with that photo is not truly clear based on the testimony between her and her mother and particularly based on Williams' later testimony that she didn't know who it was. She didn't know his name and he wasn't – he was family, but then he wasn't family. And no, he didn't have any reason to be involved in this altercation. I see that my time is up if I may briefly conclude. Because this identification was unreliable, we ask that this court reverse Mr. Ballard's conviction outright or in the alternative, remand for a new trial where counsel was ineffective. Thank you. Thank you, counsel. We appreciate your arguments. The court will take this matter under advisement and the court stands in recess.